Kell, Associate Judge.
Let injunction issue as prayed; to be dissolved on the 5th of September on motion therefor; unless the complainants satisfy the court, by affidavits, which they are hereby authorized to take before a justice of the peace, that the rail road can be located as suggested by complainants, or the same be admitted by the answers of the defendants. The affidavits to be taken upon two days notice to the opposite party or their solicitor.
Under this order the depositions of several witnesses were taken, returned, and filed. And on the 14th of September, 1831, the defendants put in their answer, in which they admit, that the acts for incorporating such a company, as the plaintiffs claim to be, were passed by the Legislature, as set forth in the bill; but they do not admit, that the actual incorporation of the plaintiffs ever did follow from those acts; or if it did, that they now have any existence as a body politic; on the contrary, they aver and believe, that James Beatty, of the city of Baltimore, is the sole, and only proprietor of the property known as the Bellona Gunpowder Com~ *444 party’s Works; and that, in consequence of there being no other corporator of the alleged company, the charter, if any ever existed, has become null and void, and the company without any right or capacity whatever to sue or be sued. That the buildings of every description erected on the land claimed by the plaintiffs, were of the meanest kind; being principally constructed of unfinished plank, and deserving more properly the appellation of sheds than houses; that the defendants were incorporated by the acts of 1827, ch. 72, and 1830, ch. 49, under the authority of which laws they had proceeded to lay out the site and route of their rail road over the land of the plaintiffs, towards the town of Westminster; the location of which branch rail road does not, in any manner, interfere with any of the charter rights or privileges of the plaintiffs; and that a location of it in any other way, even if practicable, which they deny, would involve an expenditure of from fifteen to twenty thousand dollars; that, the plaintiffs being unwilling to contract for the sale of their land to the defendants, they caused a warrant to be issued for the purpose of having it condemned to their use, according to the provisions of the acts of Assembly by which they were incorporated; but have been prevented by this injunction from completing their acquisition of a title to it in that way. The defendants further deny, that the construction of their road, as located, will prevent the plaintiffs from carrying on their manufactory; or that it will be attended with any additional hazard to the workmen employed therein; and, that instead of their branch road passing nearly a mile over the land of the plaintiffs, it crosses their land only for a distance of a hundred yards at most. The defendants deny all knowledge of the other matters set forth in the bill.
Upon the suggestion of the defendants and an affidavit of their president, the proceedings were, according to the act of 1824, ch. 196, removed from the county court of Baltimore, and filed in this court on the 16th of September, 1831. After which notice having been given under an order, according to the course of this court, of a motion to dissolve the injunction, it was accordingly brought on for a hearing.
17th October, 1831.
Bland, Chancellor.
The motion to dissolve the injunction standing ready for hearing, and the solicitors of the parties having been fully heard, the proceedings were read and considered.
It was objected that the depositions which had been taken could *445 not be read on this motion. Among the great multitude of the records of past injunction cases in this court, which I have availed myself of every opportunity to look into, I have met with but one instance in which ex parte affidavits had ever been offered or heard; with this single exception, the long and copious stream of practice, in relation to such matters, shews, that no such affidavits should ever be admitted on a motion of this kind; and therefore, as well from reason as upon authority, I have uniformly declared, that no such affidavits should be heard on a motion to dissolve, (a) But this case having been brought here from Baltimore County Court; and these not being mere ex parte affidavits, but depositions taken under the order of the 25th of August, of that court; and as in cases of this description I have not felt myself authorized to revise or reverse any order of the court from which the case comes, (b) these depositions must now be received and read, as having been sanctioned by that order.
It is a well established rule of this court, that, on a motion of this kind, the defendant can only ask for a dissolution of the injunction upon so much of his answer as is properly responsive to the bill; no new matter in avoidance, making its appearance for the first time in the answer, can, in this stage of the case, be allowed to form any part of the foundation of the defendant’s motion for a dissolution. It is a direct and responsive denial of the facts composing that case on which the plaintiff’s equity rests ■which alone can entitle the defendant to a dissolution of the injunction. (c) Hence, all that has been said by the defendants as to the plaintiffs having, in fact, no corporate capacity, must be considered as new matter in avoidance of the plaintiffs’ claim; and therefore cannot be now properly heard and determined upon.
But the suggestions which arise out of this portion of the defence, it is obvious, may be worthy of the gravest consideration *446 •when the court shall be called on for its judgment upon such a case. In the preamble of the act of 1824, ch. 32, which is one of the acts under which the plaintiffs claim to be a body politic, it is said to have been represented, that in consequence of the decrease in their number, it is impracticable, at present, to choose from their body five directors, the number prescribed by their original incorporating act of 1814, ch. 78; and therefore, it is declared, that three directors only shall be chosen to manage all the concerns of the company. Hence it would seem, that prior to the passage of the last of these acts, the body politic had actually become extinct, by reason of this impracticability of choosing five directors.
It is certainly within the constitutional scope of the powers of the General Assembly to constitute a body politic of one, or of a plurality of individuals; but if a corporate capacity be given to a plurality, and the stock of the company, by the owning of which alone any individual can be considered as a corporator, is all purchased up, and held by one, it would seem, that the body politic would be thereby virtually dissolved. And as it would seem, it might be considered as a fraudulent evasion of the law, for any one individual, who had purchased all the stock of such corporation ; to attempt to claim the benefit of the irrepealable nature of such an act of incorporation, by allowing a part of the stock to be held by one or more other persons; and so, under the disguise of being a body politic, to protect himself from a personal responsibility for his debts; and also to prevent the Legislature from altering the act of incorporation under the notion, the good sense or constitutionality of which I have never been able distinctly to understand, that it was a contract, the obligation of which they could not impair. It has always seemed to me to be very clear, that no enactment of the General Assembly, whatever might be its character, whether considered as a mere law, or as substantially a contract, should be permitted to be made an instrument of fraud; or should have its operation continued in opposition to the interests of the people, as declared by the General Assembly, at the pleasure of any one man or set of men.
The defendants in their answer lay some stress upon the peculiar character of the buildings of the plaintiffs, with which the proposed road is to interfere. Admitting this to be one of those allegations in the answer which must be considered as directly responsive to the bill; yet I do not see how the nature of the buildings, or, in other words, the mere amount of the injury likely *447 to be clone, can affect the question of right between these parties. Unless, indeed, the damage should be shewn to be so small, as, that the law would take no notice of it; as in actions of waste, where the waste is unimportant in its nature and trivial in amount. (d) But these buildings, it must be recollected, have been put up, as is alleged and admitted, for the manufacture of gunpowder; and are more properly suited for that purpose than if they had been constructed of brick, stone, or hard materials strongly bound together ; in which kind of edifices an explosion would be attended with much more certain and wide-spreading destruction than in lightly framed houses or sheds, such as these are described to be; and therefore they could not be complained of as nuisances by those residing in their vicinity; because of their being too dangerously or improperly constructed for the uses to which they are applied, (e) It is then manifest, that the plaintiffs’ cause of complaint cannot, in any sense, be deemed frivolous because of the frail nature of their buildings.
As to the mere facts of this case there is then no substantial difference between the parties. The plaintiffs assert and the defendants admit, that the proposed rail road has been located, and is intended to be constructed over a part of the land of the plaintiffs ; and that one of their edifices, erected for the manufactory of gunpowder, is intended to be removed. The distance which the road is to pass over the land of the plaintiffs, and the amount of the increased hazard, although alleged and denied, and not particularly described, are unimportant as regards the questions of right between these litigants.
By the act of 1827, ch. 72, s. 15, the plaintiffs are authorized, for the purpose of making their rail road, to agree with the owner of any land for the purchase, or use and occupation of the same, ‘and if they cannot agree, and if the owner or owners, or any of them, be a Jeme covert, under age, non compos mentis, or out of the county in which the property wanted may lie,’ application may be made to a justice of the peace, and proceedings had to have it condemned to their use. Upon which it was urged, that although the defendants may have an unlimited power to contract or agree, in any manner, with the owner for any land they may want for their road; yet the power to take the lands of others from them, against *448 their consent, by this process of condemnation, is expressly limited to the case -where they, the defendants, cannot agree, and the owner is a feme covert, &c.; or, in other words, that the defendants must be unable to agree with the owner, and the owner must also be a feme covert, &c. Because as this provision authorizes these defendants to take from a citizen his property, against his will, it must be construed strictly; and therefore the word and cannot, in this instance, be construed to mean or; and consequently, that concurrence of circumstances has not been shewn to exist, which is indispensably necessary, according to the positive requisitions of this law, to enable these defendants to have the land of the plaintiffs taken from them without their consent.
I admit, that this section of the act, by which the defendants have been incorporated, is of such a character as to require to be construed strictly. But the whole must be so taken together as to carry into effect the chief and manifest purpose of the law; unless the sense of the expressions used be such as to forbid their being interpreted in any but one way; and when so taken, that the mode, of proceeding prescribed cannot be so executed as to attain the object.
It was manifestly the intention of the Legislature to authorize the defendants to acquire any land they might want for their rail road in one of two modes; first, by an agreement.with the owner of it; or if it could not be obtained in that way, either because of the absence of the owner, or because of his refusal to agree; or because of his incapacity to contract, then the defendants should have the power to cause it to be condemned to their use at a fair valuation. This latter mode of acquisition was intended to be given to them in all cases where an agreement could not be effected. In case of the refusal of the owner; and in the case of his absence; and in the case of his inability to contract. In all the similar sections found in other acts of incorporation, the word or is used in place of the word and, found in this section; so as, in effect, to declare, that where the acquisition could not be made because of the refusal of the owner, or because of his. absence, or because of his inability to contract, that then the body politic might condemn, <fcc.; and such a turn of expression, it may be admitted, does much more perspicuously express, what is obviously the intention of the Legislature, by all such enactments, than in this instance. But the expressions used in this act do, with sufficient clearness, convey the same intention. The fair sense of the section under *449 consideration is, that, in all cases, where the assent of the owner cannot be had, as in the case of his withholding it; and of his not being present to give it; and also of his not having a mental capacity to contract, the body politic may condemn ; that is, in each one, and in all those cases he may condemn ; but in the other similar enactments, where the disjunctive turn of expression is used, it is in substance declared, that in either, or in any one of those cases the acquisition may be made by condemnation. The necessary and obvious meaning of both forms of expression is, however, entirely the same; hence there is no foundation for this objection.
The plaintiffs in the next place rest their equity to have the defendants enjoined, upon the ground, that their property is held, as a part of their franchise, under a contract with the state, which the General Assembly can by no subsequent enactment impair. Among the other restrictions imposed upon the powers of the state governments, by the tenth section of the first article of the constitution of the United States, it is declared, that no state shall pass any law impairing the obligation of contracts.
It is not my intention, upon this occasion, to enter upon an enquiry as to what was the cause of this restriction, or to express any opinion as to its trae sense and bearing-. But, taking it for granted, as it seems to have been in the argument, that this restriction may be enforced against the states by one of the branches of the Federal government, according to the full extent of the jurisdiction assumed by the Supreme Court of the United States; and it may be admitted, that an act of the Legislature of a state, granting permission to individuals to take upon themselves the franchise of a body politic, when accepted by them, is a contract, within the meaning of this restriction ; yet after all this shall have been granted in its fullest latitude, the question returns ; does the taking of the plaintiffs’ land, in the manner proposed, in the smallest degree impair the obligation of the contract between them and the state ?
The legislative department of this state government, by its act of incorporation, or contract, if it must be so considered, gave 1o the plaintiffs nothing more than a license to purchase and hold lands, and to do certain other acts as a body politic. The acquisition of property and the manufactories, which they were authorized to make, and to carry on, were such acts as an individual might lawfully have done. Hence the whole scope of the act of incorporation, or contract between the state and the plaintiffs was, that the authority to do those acts as a corporation, should be secured *450 to them in that capacity, and nothing more. The General Assembly did not; and, it may be affirmed, could not enact, or covenant with the plaintiffs, that the land held by them should be considered as an estate more favoured and sacred than that of any individual citizen of the Republic; for, as it has been said, even the parliament of England, with all its unlimited sovereignty, cannot legally make any partial distinctions among the subjects of the realm, (f) All or any of the property of a citizen may be taken, upon a just compensation being made, and applied to the use of the public; and all property belonging, in like manner, to a corporation, must also be held liable to the same eminent domain, or peculiar power of the government.
The only plausible ground upon which any portion of the territory of the Republic could be exempted from a liability to the exercise of this power of the government of the state would be, that it had been previously applied to some greater or equally beneficial public use, with which the proposed new application was incompatible. But there is no pretext for claiming an exemption, upon that or any other principle, in favour of the land held by these plaintiffs; because it cannot, in any sense whatever, be considered as having been appropriated to any public use; it is merely held as private property, for the peculiar emolument of its incorporated owners, and which they may dispose of at their pleasure. The tenure by which they hold it forms no part of that which is of the essence of their act of incorporation, or the alleged contract between them and the state. There is therefore nothing in the acts incorporating the plaintiffs, even considered as a contract, which can be so construed as to prevent the condemnation of their land to a public use in the manner proposed by the defendants.
The plaintiffs have urged, that the application of their land to the purposes of the rail road proposed to be made by the defendants, is not such a public use as can justify the taking of it without their consent; although it should be agreed, on all hands, that the private property of corporations as well as of individuals, might be taken for any public purpose on a just compensation being made for it.
Under our government the property of one man cannot betaken without his consent, and given to another by any form of proceeding ; and, consequently, no citizen can be compelled to part with *451 his property, even on a just compensation being made, but for some public purpose. It is the public good alone which can sanction such a compulsory alienation of the property of a citizen. The point of this objection is, therefore, that the taking of this private property for the construction of the proposed rail road is an application of it to a private and not to a public use.
But the exercise of this power of the government of the state is not confined to those cases only in which the private property taken is to be applied immediately, directly, and exclusively to some public use, as to the making of an open highway or the like; for, it is enough, if it clearly appears, that the application of such private property to the proposed new use will be attended by a material public benefit which would not otherwise be so immediately and effectually produced. And, therefore, if it be shewn, that such a public good must necessarily be the result of such an application of the private property, it is of no consequence whether the condemnation or compulsory alienation places it in the hands of the state, of a corporation, or even of an individual. In all such cases the General Assembly may justly authorize a condemnation of any private property for such a public benefit, by such proceedings as are proposed to be prosecuted by these defendants. (g)
It may, in some cases, be difficult, in this respect, to distinguish between a public and a private use, and to determine how far this exercise of the government’s power of eminent domain may be carried. But in this case I deem it sufficiently clear, that the construction of a rail road, as proposed by the defendants, must result in such a general advantage to the people as to warrant the court in pronouncing it such a public use as affords an ample justification of the proceeding by which the plaintiffs may be compelled to part with their land on receiving for it a just compensation'. Hence there is no foundation for this objection of the plaintiffs.
The plaintiffs, after taking a comparative view of the fifteenth, sixteenth, seventeenth and nineteenth sections of the act by which the defendants have been incorporated, contended that the defendants’ authority to acquire a title to land for the use of their rail road must be confined altogether to such land as is held by individual citizens, by mere natural persons.
But a fictitious body of citizens, formed by charter, is as a mere citizen, as natural bodies in a state of subjection to the government *452 of the country, and, therefore, they are, as regards their property at least, pure citizens to all intents and purposes whatever, (h) The fifteenth section gives to the defendants a voluntary, and a compulsory mode of acquiring land for the use of their rail road from the owners of it. They may agree with the owners if they can; if not then, they may force the owners to alienate in the manner prescribed. There is not the slightest intimation of any distinction as to the character of the owners so spoken of; except where it is said that if the owners, or any of them, he a feme covert, &c. But this rather tends to enlarge than restrain the comprehensive meaning of the term owners, by which all must be embraced, whether natural or artificial persons; bodies politic as well as individuals. So far it seems to be admitted, that this act is clear of all ambiguity.
But the sixteenth, seventeenth and nineteenth sections do not, in any manner, modify or restrain the general terms of the fifteenth section. It appeared, that the proposed rail road, in its route, must cross many highways; and that it might be convenient to allow it to pass along the same route then occupied by an existing turnpike, or over a public bridge-; and it also appeared, that in all this there was nothing so incompatible as that the one road should be allowed to obstruct or destroy the other. And therefore it was declared, that the defendants should be authorized to construct their rail road across any established road, so that it did not impede its passage; and also, that they might contract for the use of any turnpike or bridge with which it might be necessary or advantageous to connect their rail road. The manifest intention of these enactments was to provide for the preservation of the then existing and established public uses to which any land might have been subjected; so that, in creating one public convenience another public convenience might not be destroyed. It was the preservation and making compatible with each other two or more public uses which might be brought into collision with each other, so that the people might be deprived of none of their public benefits, which was the sole and only object of these latter sections; and considered in this light they accord, in every respect, and perfectly, with all that is declared in the fifteenth section ; and can, by no means, be considered as altering or restraining any right or power *453 there given to the defendants. Hence I am perfectly satisfied,, that there is no foundation for this last objection of the plaintiffs.
Whereupon it is Ordered, that the injunction heretofore granted in this case, be and the same is hereby dissolved.

 It has been since declared, that the court, on application of any of the parties, may order testimony, in reference to the allegations of the bill, to bo taken on behalf of all the parties, in such form as it may direct, and on such terms, and under such regulations, as to notice and otherwise, as may be deemed equitable; and so, however, that such testimony be returned by the day when the motion for dissolving such injunction shall be heard; and the order providing also, that notice of the granting such order be given as shall be prescribed by the court, on part of the party applying for the order, to the other parties named in the bill or their solicitor; and such testimony, at the hearing of such motion, shall be considered in connection with the bill, or petition and answers in the cause ; 1885, ch. 380, s. 8.

 Strike’s case, 1 Bland, 67.

 Salmon v. Clagett, ante 159.

 The Governors of Harrow School v. Alderton, 2 Bos. & Pul. 86; The Universities of Oxford v. Richardson, 6 Ves. 706.

 Crowder v. Tinkler, 19 Ves. 626.

 Kames Pri. Eq. b. 2, c. 3.

 Pressly’s Case, ante 390, note.

 Nabob of Arcot v. The East India Company, 3 Bro. C. C. 303.